**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

```
_____
                                     )
SERVICE EMPLOYEES                    )
INTERNATIONAL UNION                  )
NATIONAL INDUSTRY                    )
PENSION FUND, et al.,                )
                                     )
            Plaintiffs,              )
                                     )
      v.                             )        Civil Action No. 23-0763 (ABJ)
                                     )
VISTACARE LLC, et al.,               )
                                     )
            Defendants.              )
_____)
```

**<u>MEMORANDUM OPINION</u>**

In this case, the Service Employees International Union National Industry Pension Fund ("Pension Fund" or "Fund") and its Board of Trustees brought suit against Vistacare LLC ("Vistacare") and 300 Broadway Healthcare LLC ("300 Broadway") to recover delinquent payments and reports owed to the Fund on behalf of the employees of the New Vista Nursing and Rehabilitation Center ("New Vista"). Compl. [Dkt. # 1] ¶ 1. New Vista entered into several agreements with 1199SEIU United Healthcare Workers East ("the Union") covering the period between March 1, 2012 and December 31, 2024 that obligated it to submit monthly payments and "remittance reports" to the Fund. Compl. ¶¶ 1, 10. Plaintiffs allege that defendants frequently failed to comply with those obligations, in violation of the Employee Retirement Income Security Act, 29 U.S.C. § 1132 *et seq.*, and that defendants are liable for a prior judgment against a predecessor entity, TNUZEG Holdings LLC, arising out of similar violations. Compl. ¶¶ 40–50.

Plaintiffs filed the complaint on March 21, 2023. *See* Compl. On May 9, 2023, before service could be effectuated on defendant 300 Broadway, plaintiffs notified the Court that

300 Broadway had filed a petition for bankruptcy in the United States Bankruptcy Court for the District of New Jersey ("Bankruptcy Court"). Notice of Bankruptcy [Dkt. # 3]. The Court stayed the action as to 300 Broadway. Minute Order (May 10, 2023). Defendant Vistacare was served on June 5, 2023, it answered the complaint, and plaintiffs and Vistacare engaged in discovery. Return of Serv. Aff. [Dkt. # 5]; Answer [Dkt. # 6]; Scheduling Order [Dkt. # 11].

On August 28, 2023, plaintiffs informed the Court that the Bankruptcy Court dismissed 300 Broadway's bankruptcy suit, Notice Regarding Dismissal of Bankruptcy Case [Dkt. # 12], and the Court lifted the stay. Minute Order (Aug. 29, 2023). The complaint was served on 300 Broadway on October 23, 2023. Return of Serv. Aff. [Dkt. # 23]. The entity did not respond or otherwise enter the case, and plaintiffs filed an affidavit for default on November 15, 2023. Aff. for Default [Dkt. # 23]. The Clerk of Court entered a default against 300 Broadway on November 16, 2023, Clerk's Entry of Default [Dkt. # 24], and plaintiffs filed a motion for partial default judgment on August 16, 2024. Pls.' Mot. for Partial Default J. [Dkt. # 33] ("Mot. for Default J.").

Upon completion of discovery with defendant Vistacare, on November 8, 2024, plaintiffs filed a motion for summary judgment against Vistacare which included an accounting of the missing payments that had accrued up until that point. Pls.' Mot. for Summ. J. [Dkt. # 35] ("Mot. for Summ. J."); Attachment 6 to Decl. of Brittany Macomber [Dkt. # 35-4]. The parties fully brief the motion. *See* Def.'s Opp. to Mot. [Dkt. # 37] ("Opp. to Summ. J."); Reply in Supp. of Mot. [Dkt. # 38] ("Reply for Summ. J.").

On January 8, 2026, the Court ordered the parties to provide further information regarding New Vista's ownership history and 300 Broadway's liability, Minute Order (Jan. 8, 2026), and both parties responded with supplemental memoranda. Def.'s Suppl. Resp. [Dkt. # 39]; Pls.' Suppl. Mem. [Dkt. # 40]. Because plaintiffs' memorandum was accompanied by an accounting

of missed payments that had accrued until December 2025, Attachment 6A to Suppl. Decl. of Brittany Macomber [Dkt. # 40-1], the Court issued another order directing them to revise the calculation to include only the amount that had accrued under the period covered by the agreements between New Vista and the Fund.  Minute Order (Jan. 26, 2026).  Plaintiffs responded with the revised accounting on January 29, 2026.  Pls.' Second Suppl. Mem. [Dkt. # 41]; Second Suppl. Decl. of Brittany Macomber, Ex. D to Pls.' Second Suppl. Mem. [Dkt. # 41-1] ("Second Suppl. Macomber Decl."); Attachment 6B to Second Suppl. Macomber Decl. [Dkt. # 41-1] ("Revised Delinquency Spreadsheet").

For the reasons set forth below, plaintiffs' motion for summary judgment against Vistacare and motion for partial default judgment against 300 Broadway will be **GRANTED IN PART** and **DENIED IN PART**:  the Court finds that the two limited liability companies are joint and severally liable for New Vista's outstanding pension contributions and the unpaid judgment against TNUZEG, and that they are responsible for the missing reports.  But it will deny plaintiffs' request for a permanent injunction that they submit all required reports in the future.

## BACKGROUND

The SEIU National Industry Pension Fund is a jointly administered, multi-employer pension fund that provides "retirement benefits to eligible employees who are represented by an SEIU local union."  Pls.' Statement of Undisputed Material Facts [Dkt. # 35-2] ("PSUMF") ¶¶ 4–5, citing Decl. of Brittany Macomber, Ex. A to Mot. for Summ. J. [Dkt. # 35-4] ("Macomber Decl.") ¶ 2.  Hundreds of employers make monthly contributions to the Pension Fund on behalf of their eligible employees.  PSUMF ¶¶ 2, 6–7.  The Fund is administered in the District of Columbia, and it is "governed by a Board of Trustees made up of equal numbers of labor and management representatives."  PSUMF ¶¶ 1, 3.

New Vista is a nursing and rehabilitation center located at 300 Broadway, Newark, New Jersey.  PSUMF ¶¶ 8–9, citing Decl. of Adam Bellotti, Ex. B to Mot. for Summ. J. [Dkt. # 35-5] ("Bellotti Decl.") ¶ 3 and Attachment 1 to Bellotti Decl. [Dkt. # 35-5] ("Kleiman Dep.") at 30; Def.'s Resp. to PSUMF [Dkt. # 37-1] ¶¶ 8–9.  Its ownership structure has undergone several iterations.  From 1999 to 2016, the nursing home was owned by 300 Broadway Healthcare Center, LLC.  PSUMF ¶¶ 43–44; Def.'s Resp. to PSUMF ¶¶ 43–44.  A team of five investors, including George Weinberger, Harold Goldenberg, Hadassah Schwartz, and brothers Brian and Steven Kleiman, formed the entity that purchased New Vista, but when structuring the deal, Brian and Steven Kleiman decided to "put [their] shares" of the business in the names of their wives – Rivka B. Kleiman and Rivka C. Kleiman.  PSUMF ¶¶ 45–46, citing Kleiman Dep. at 47:7–16.  Thus, it was Rivka B. Kleiman, Rivka C. Kleiman, George Weinberger, Harold Goldenberg, and Hadassah Schwartz who "collectively held 100% of the ownership or membership interest" in 300 Broadway and New Vista at that time.  PSUMF ¶ 47; Def.'s Resp. to PSUMF ¶ 47.

On February 10, 2016, another entity, TNUZEG Holdings LLC, purchased the interests of Weinberger, Goldenberg, and Schwartz in 300 Broadway.  PSUMF ¶ 48, citing Kleiman Dep. at 30, 121–26; February 10, 2016 Membership Purchase Agreement, Attachment 12 to Bellotti Decl. [Dkt. # 35-5] at NEW VISTA - 000081–107.  TNUZEG was owned entirely by Rivka B. and Rivka C. Kleiman, and it operated New Vista from early 2016 to late 2017.  PSUMF ¶¶ 49–51, citing Kleiman Dep. at 107, 108, 114, 125–26.

In late 2017, TNUZEG sold its interests in New Vista to the newly formed Vistacare LLC, which was also entirely owned by Rivka B. and Rivka C. Kleiman.  PSUMF ¶ 52, citing Kleiman Dep. at 129–30.  There is no documentation of the sale in the record, and the testimony concerning the date of the transition is vague, *see* Kleiman Dep. at 107:22–25 ("Q: When did TNUZEG stop

operating the nursing home?  A: I believe sometime in 2017 – maybe late 2017."), but there is no dispute that Vistacare immediately began operating the nursing home.  PSUMF ¶¶ 55, 59; Def.'s Resp. to PSUMF ¶¶ 55, 59.  Neither Rivka B., nor Rivka C. Kleiman was ever involved in the day-to-day operations of New Vista, though.  PSUMF ¶¶ 54–55, citing Kleiman Dep. at 109 ("Q:  [D]id either of the Rivka Kleimans have any management role or role in the day-to-day operations of the nursing home? . . .  A:  The answer's no."); Decl. of Rivka B. Kleiman, Attachment 3 to Bellotti Decl. [Dkt. # 35-5] ¶ 5; Decl. of Rivka C. Kleiman, Attachment 4 to Bellotti Decl. [Dkt. # 35-5] ¶ 5.

New Vista has been governed by three instruments that required it to make contributions to the Pension Fund on behalf of its employees represented by the local Union.  PSUMF ¶¶ 10, 11–12, 15.  The first set of obligations was set forth in an arbitration award that established the amount New Vista was to contribute to the Fund from March 1, 2012 through June 30, 2016.  PSUMF ¶ 11; Attachment 9 to Bellotti Decl. [Dkt. # 35-5] at NEW VISTA-000022.  New Vista's base contribution was set at $0.0275 per dollar of gross salary earned by each covered employee, and it was also obligated to make supplemental contributions in accordance with a "Preferred Schedule," which New Vista had previously adopted.  Attachment 9 at NEW VISTA-000022.[1]

The second document was a "memorandum of agreement" between the Union and New Vista that governed the nursing home's contribution obligations from July 1, 2016 to December

---

1    Because the Fund fell into "critical status" in 2009, the Board of Trustees promulgated a "Rehabilitation Plan" which obligated employers to adopt a schedule to make supplemental contributions.  PSUMF ¶¶ 23–25; Attachment 2 to Macomber Decl. [Dkt. # 35-4].  On November 7, 2012, New Vista adopted the "Preferred Schedule," which required a supplemental contribution at a rate of 27.7 percent of base contributions that increased annually until reaching 169.4 percent of base contributions in 2022.  PSUMF ¶¶ 29–30; Attachment 3 to Macomber Decl. [Dkt. #35-4]; Attachment 9 at NEW VISTA-000022.

13, 2020.  PSUMF ¶¶ 12–13; Attachment 10 to Bellotti Decl. [Dkt. # 35-5] at NEW VISTA - 000026.  Under this agreement, the base contribution remained at $0.0275 per dollar of gross salary earned by the covered employee, with supplemental contributions to be made on the Preferred Schedule.  *Id.*  The third document, another memorandum of agreement, set New Vista's obligations from December 14, 2021 to December 31, 2024, requiring it "continue contributing to the [Pension Fund] in accordance with the preferred schedule" with the same base contribution rate.  PSUMF ¶ 15; Attachment 11 at NEW VISTA - 000028–29.

As a contributing employer, New Vista was also bound by the Pension Fund's Statement of Policy for Collection of Delinquent Contributions ("Collections Policy").  PSUMF ¶ 31; Attachment 4 to Macomber Decl. [Dkt. # 35-4] at NIPF-VISTACARE_000033–41.[2]  The Collections Policy required that New Vista pay contributions "by the 15th day of the month following the month in which work was performed for which the contributions are owed."  *Id.* at NIPF-VISTACARE_000033–34.  It also required the employer to provide a "remittance report" with each monthly contribution payment that would include the covered employees' names, hours worked, and gross pay.  *Id*.

Under the Collections Policy, if an employer failed to pay a contribution "by the last day of the month in which the contributions were due," it would be obligated to pay interest calculated "from the due date for the delinquent contribution[] through and including the date payment is actually received by the Fund . . . at the rate of ten percent (10%) per annum."  *Id.* at NIPF-

---

[2]    New Vista was bound by the Collections Policy by way of the Pension Fund's Agreement and Declaration of Trust ("Trust Agreement"), which required each employer participating in the Fund to abide by all the "rules and regulations adopted by the Trustees," including the Collections Policy.  PSUMF ¶ 18; Attachment 1 to Decl. of Brittany Macomber [Dkt. # 35-4] at NIPF-VISTACARE_000212.

VISTACARE_000034.  Interest on net contributions due would also collect interest "at a rate of ten percent . . . per annum."  *Id.* at NIPF-VISTACARE_000035.  The employer would also be "obligated to pay liquidated damages in the amount of [five percent] of the Monthly Contribution[] Owed, with a minimum of $50 for each month's delinquency."  *Id.*  And for underpayments, "[i]f litigation has commenced," the employer would be obligated to pay "liquidated damages in the greater of (a) the total of the interest owed on the underpayment or (b) 20% of the underpayment."  *Id.*

### A.  New Vista's Failure to Meet its Payment Obligations in May 2017 and After

The Pension Fund has recorded New Vista's unpaid contributions and calculated the resulting interest and liquidated damages in its "Delinquency Spreadsheet."  Attachment 6 to Macomber Decl. [Dkt. # 35-5] ("Delinquency Spreadsheet") at 88–90; Revised Delinquency Spreadsheet at 1–3. Each row of the Spreadsheet shows the month for which New Vista underpaid or untimely paid its contribution obligation.  *Id.*  The columns of the sheet record: (1) the date on which the payment was due; (2) the date on which New Vista actually made the payment, if at all; (3) the gross salary for the covered employees on whose behalf the contribution was made; (4) the base contribution due; (5) the supplemental contribution due; (6) the amount actually received by the Fund; (7) the amount of interest accrued for late and underpaid payments; and (8) the amount of liquidated damages for late and underpaid payments.  *Id.*; PSUMF ¶¶ 36–41, 95.

According to the sheet, New Visa failed to pay, underpaid, or late-paid its contributions on multiple occasions during the period between May 2017 and December 2024.[3]  It failed to submit

---

3    The facts in this section are based on plaintiffs' most recent Delinquency Spreadsheet.  *See* Revised Delinquency Spreadsheet [Dkt. # 41-1].

any monetary contributions or remittance reports for the months of October, November, and December 2024.  Revised Delinquency Spreadsheet at 2–3.  It failed to pay the full contribution amount for the months of May, June, and July 2017, and January 2023.  *Id.* at 1, 2.  And it failed to timely pay contributions for July 2017, July 2020 through January 2021, March 2021 through June 2021, September 2021, October 2021, January 2022 through September 2022, November 2022 through July 2023, October 2023, December 2023, January 2024, March 2024, May 2024, August 2024, and September 2024.  *Id.* at 1–3.

New Vista also failed to submit timely remittance reports to the Fund for the months of July 2017, March 2020, January 2022, March 2022, November 2022, December 2022, February 2023, May 2023, July 2023, August 2023, September 2023, October 2023, November 2023, January 2024, February 2024, March 2024, May 2024, June 2024, July 2024, and August 2024.  PSUMF ¶ 81, citing Macomber Decl. ¶ 23.  And it failed to submit a remittance report at all for September 2024.  PSUMF ¶ 82, citing Macomber Decl. ¶ 23.[4]

### B.  The Fund's Previous Attempt to Recover from New Vista

In addition to the delinquent contributions in the instant suit, plaintiffs also claim that defendants are liable for the unsatisfied prior judgment against the predecessor entity, TNUZEG Holdings LLC, for delinquent payments from an earlier period.  Compl. ¶¶ 47–50.

---

[4]    New Vista fulfilled some of its previous missing contribution payments and remittance reports since the filing of the instant suit.  On March 21, 2023, it paid $55,564.20 in outstanding contributions for the months of January 2022, February 2022, and March 2022.  PSUMF ¶ 83, citing Attachment 14 to Bellotti Decl. [Dkt. # 35-5] at NEW VISTA - 000073.  By December 29, 2023, New Vista had also made payments for the months of February 2023 and May 2023 totaling to $44,008.45.  PSUMF ¶ 84, citing Attachment 15 to Bellotti Decl. [Dkt. # 35-5] at 199.  And it has submitted several late remittance reports to the Fund over the course of litigation.  PSUMF ¶ 81, citing Macomber Decl. ¶ 23.

There were issues with TNUZEG's compliance with New Vista's pension contribution obligations between July 2013 and April 2017, and the Pension Fund brought an action against TNUZEG in 2017. *See SEIU Nat'l Indus. Pension Fund v. Tnuzeg Holdings, LLC*, Civ. Action No. 17-1665, 2018 WL 3962925 (D.D.C. 2018). Another court in this district entered judgment against TNUZEG, ordering it to pay $194,390.51 in delinquent contributions, interest, and liquidated damages "for the period of July 2013 through April 2017," as well as $8,301.00 in attorneys' fees. *Id.* at *1; Order, Attachment 7 to Macomber Decl. [Dkt. # 35-4]; Order, Attachment 8 to Macomber Decl. [Dkt. # 35-4]. That judgment has not been paid. PSUMF ¶ 73; Def.'s Resp. to Pl.'s First Set of Reqs., Attachment 7 to Bellotti Decl. [Dkt. # 35-5] ¶ 7.

## STANDARD OF REVIEW

### a.    Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). To defeat summary judgment, the non-moving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted).

The mere existence of a factual dispute is insufficient to preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A dispute is "genuine" only if a reasonable fact-finder could find for the non-moving party; a fact is "material" only if it is capable

of affecting the outcome of the litigation. *Id.* at 248; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987). In assessing a party's motion, the court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the summary judgment motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alterations omitted), quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam).

### b.    Default Judgment

Federal Rule of Civil Procedure 55(a) provides that the clerk of the court must enter a party's default "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise." Fed. R. Civ. P. 55(a). After a default has been entered, a court may enter a default judgment order pursuant to Rule 55(b). Although there is a general "federal policy favoring trial over default judgment," *Whelan v. Abell*, 48 F.3d 1247, 1258 (D.C. Cir. 1995), "when the adversary process has been halted because of an essentially unresponsive party . . . , the diligent party must be protected" by awarding a default judgment. *Gilmore v. Palestinian Interim Self-Gov't Auth.*, 843 F.3d 958, 965 (D.C. Cir. 2016) (omission in original), quoting *H.F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*, 432 F.2d 689, 691 (D.C. Cir. 1970) (per curium).

Whether default judgment is appropriate is in the discretion of the trial court. *Keegel v. Key West & Caribbean Trading Co.*, 627 F.2d 372, 375 n.5 (D.C. Cir. 1980); *Jackson v. Beech*, 636 F.2d 831, 835 (D.C. Cir. 1980). Upon entry of default by the clerk of the court, the "defaulting defendant is deemed to admit every well-pleaded allegation in the complaint." *Int'l Painters & Allied Trades Indus. Pension Fund v. R.W. Amrine Drywall Co., Inc.*, 239 F. Supp. 2d 26, 30 (D.D.C. 2002), citing *Trans World Airlines, Inc. v. Hughes*, 449 F.2d 51, 63 (2d Cir. 1971).

"Although the default establishes a defendant's liability, the court is required to make an independent determination of the sum to be awarded unless the amount of damages is certain." *Id.*, citing *Adkins v. Teseo*, 180 F. Supp. 2d 15, 17 (D.D.C. 2001). Accordingly, when moving for a default judgment, the plaintiff must prove its entitlement to the amount of monetary damages requested. *Id.* (citation omitted). "In ruling on such a motion, the court may rely on detailed affidavits or documentary evidence to determine the appropriate sum for the default judgment." *Id.* (citation omitted).

## ANALYSIS

The motion for summary judgment against Vistacare and the motion for default judgment against 300 Broadway seek the same relief: (1) an order that the defendant subject to the motion pay New Vista's outstanding contributions, along with accumulated interest, liquidated damages, and attorneys' fees, and that the outstanding reports be submitted; (2) an order that defendant must satisfy the outstanding judgment against TNUZEG; and (3) an injunction requiring the defendant to submit monthly remittance reports in a timely manner and make all past and future payments due to the Fund.[5] Mot. for Summ. J. at 21; Mot. for Default J. at 1; Compl. at 11–12. Because the defendants are in different procedural postures, the Court will address each motion separately.

---

5       The request for injunctive relief in the complaint is not consistent with the requests in the motions. *Compare* Compl. at 12 (seeking "[a]n injunction requiring Defendants to comply with its obligations to submit monthly remittance reports to the Pension Fund in a timely manner and make all past and future payments due to the Pension Fund") *and* Mot. for Default J. at 1 (seeking an injunction requiring defendants to "comply with its ongoing obligation to pay the Fund timely contributions for hours worked") *and* Mot. for Summ. J. at 21 ("[A]n injunction requiring Defendant to comply with its obligations to submit monthly remittance reports along with required contributions to the Pension Fund in a timely manner[.]"). The Court will deem the request for injunctive relief to be the broadest relief requested in the complaint.

I.      **Plaintiffs are entitled to partial summary judgment against defendant Vistacare.**

      a.  **Vistacare is liable for the delinquent contributions, interest, liquidated damages, and attorneys' fees.**

The Employee Retirement Income Security Act "makes a federal obligation of an employer's contractual commitment to contribute to a multiemployer pension fund." *Flynn v. R.C. Title*, 353 F.3d 953, 958 (D.C. Cir. 2004). Section 1145 of ERISA directs that:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1445.  When a fiduciary brings an action on behalf of a plan to enforce section 1145 and obtains a judgment in its favor, section 502(g)(2) of ERISA directs that courts "shall" award: (1) "the unpaid contributions"; (2) "interest on the unpaid contributions"; (3) "an amount equal to the greater of–interest on the unpaid contributions, or liquidated damages provided for under the plan in an amount not in excess of 20 percent . . ."; and (4) "reasonable attorney's fees and costs of the action, to be paid by the defendant . . . ." 29 U.S.C. § 1132(g)(2)(A)–(D).  The same section also directs that "interest on unpaid contributions shall be determined by using the rate provided under the plan." *Id*. § 1132(g)(2)(E).

Count One of the complaint alleges that Vistacare is liable under ERISA for New Vista's delinquent contributions, the resulting interest and liquidated damages, and attorneys' fees. Compl. ¶¶ 40–43; Mot. for Summ. J. at 11–12.  Specifically, the Fund's records show that New Vista owes it:  (1) $96,008.79 in missing contributions; (2) $44,584.09 in interest; and (3)

$50,101.24 in liquidated damages. Second Suppl. Macomber Decl. ¶ 3; Revised Delinquency Spreadsheet.[6]

The facts underlying this claim are largely undisputed. It is undisputed that New Vista entered into agreements that obligated it to make contributions and supplemental contributions to the Fund on behalf of the covered employees of New Vista at an established rate, PSUMF ¶ 10; Def.'s Resp. to PSUMF ¶ 10, and that Vistacare assumed responsibility for the missing pension contributions from May 2017 onward. PSUMF ¶ 74; Def.'s Resp. to PSUMF ¶ 74. It is also undisputed that New Vista was bound by the Fund's Collection Policy, which required it to make payments by a certain date and set additional parameters for interest and liquidated damages on late and unpaid contributions. PSUMF ¶¶ 18–20; Def.'s Resp. to PSUMF ¶¶ 18–20; Attachment 4 at NIPF-VISTACARE_000033–34. Finally, it is undisputed New Vista has missed contribution payments, and that it has submitted several contribution payments late. PSUMF ¶ 87; Def.'s Resp. to PSUMF ¶ 87.

Vistacare disputes only the amount it owes the Fund in underpaid contributions for May 2017, June 2017, July 2017, and January 2023, and the total amount of interest and liquidated damages. Def.'s Resp. to PSUMF ¶¶ 85, 90, 96–97. It argues that the Fund's calculation of those amounts in its Delinquency Spreadsheet is not sufficient because "only certain union employees [were] entitled to have contributions made on their behalf," and the Fund has not proven that the

---

[6]    Plaintiffs' supplemental briefing argues that defendants should be held liable for the missing contribution payments that have accrued until the date of the Court's judgment. Pls.' Second Suppl. at 3. Even if defendants had an ongoing obligation to pay past the date of agreements in the record, the Court is ruling on a motion for summary judgment based on a complaint covering a particular time frame, facts that have been subject to discovery, and legal arguments that have been thoroughly briefed by both sides, and it will not consider further payments that have not been subject to that process.

employees for which New Vista owes contributions were actually entitled to the contributions. Opp. to Summ. J. at 7.

That argument does not stand up to scrutiny when one looks at how the Fund calculated the amount New Vista owes, which is explained by the declaration of its Contribution and Compliance Manager. *See* Macomber Decl. Each time an employer makes a monthly payment to the Fund, it also submits a remittance report that includes a list of every covered employee included in that payment, the hours each employee worked during the relevant period, the gross pay that each employee earned for those hours worked, and the total gross pay of all the employees included in the report. *Id*. ¶ 7–8. Then,

> [u]sing [the] submitted remittance report[], the Pension Fund . . . records the total salary reported for covered employees and . . . calculates and records the monthly contributions owed for each employer. If the amount submitted by the contributing employer is different from the amount due as calculated by the Pension Fund based on the employer's remittance report, the Pension Fund calculates and records the monthly underpayment or overpayment by each employer. The Pension Fund also calculates any interest on late, unpaid, or underpaid contributions.

*Id*. ¶ 9. If the Fund does not receive a remittance report with a contribution payment, it "estimate[s] the contributions based on the most recent contributions remitted to the Pension Fund." *Id*. ¶ 12.

The Fund created the Delinquency Spreadsheet in accordance with this procedure. *Id*. ¶ 10, 19, 21, 26. For example, New Vista sent the Fund a remittance report with its contribution payment for the month of March 2023 that listed the employees for which it was paying contributions, each individual's gross pay, and the total gross pay for all the employees listed. Attachment 5 to Macomber Decl. [Dkt. # 35-4] ("March 2023 Remittance Report") at NIPF-VISTACARE_000666–668. The Fund took the total gross pay from the remittance report, and used that number to calculate the amount New Vista owed in contributions by multiplying the gross pay by the base contribution rate. Revised Delinquency Spreadsheet at 2. It also calculated

New Vista's supplemental contribution by multiplying the total amount of base contributions by the rate set by the Preferred Schedule. *Id.* And because New Vista paid its March 2023 contribution forty-eight days late, the Fund also calculated the amount of interest and liquidated damages due for the late payment. *Id.* All of those calculations were based on the total gross pay reported in New Vista's remittance report.

At this stage in litigation, defendant must raise a genuine factual dispute as to the Fund's calculation by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c). It has failed to do so here largely because the facts it disputes – the number of "employees for which [it] owes contributions" and the amount it owes for those employees – come from its own remittance reports. In the absence of evidence that gives rise to a genuine factual dispute, defendant cannot defeat summary judgment by simply suggesting that its own reports may have been overinclusive. *See Servs. Emps. Int'l Union Nat'l Pension Fund v. Harborview Healthcare Ctr. Inc.*, 191 F. Supp. 3d 13, 19 (D.D.C. 2016) ("[D]efendant cannot avoid summary judgment simply by speculating that plaintiffs may have erroneously included ineligible hours [in a Delinquency Spreadsheet] without offering any evidentiary support for that contention."); *Serv. Emps. Int'l Union Nat'l Indus. Pension Fund v. Bristol Manor Healthcare Ctr., Inc.*, 153 F. Supp. 3d 363, 375 (D.D.C. 2016) ("If [the defendant] believes the summary evidence to be inaccurate, then the burden falls on [the defendant] to rebut it with affirmative evidence of its own.").

Defendant's only attempt at pointing to material in the record to dispute the calculations is its citation of the deposition testimony of one of its employees, Jack Klugman. Opp. to Summ. J. at 7, citing Dep. of Jack Klugman, Attachment 2 to Bellotti Decl. [Dkt. # 35-5] ("Klugman Dep.") at 43:2–45:7. According to defendant, Klugman's deposition shows that New Vista's remittance reports were "generated based upon [its] payroll system" and that it was "not known how or what

criteria are used to determine which union employees are included in the payroll system generated

report." *Id.* But that mischaracterizes Klugman's deposition testimony. He explained:

> Q: . . . [W]hat is the first step in the process of New Vista making a
> payment to the pension fund?
>
> * * *
>
> A: I – payroll generates a report for the pension, that report is sent to this
> company . . . and they go ahead and process payment.
>
> Q: You say payroll generates a report; what do you mean by payroll?
>
> A: The payroll system.
>
> * * *
>
> Q: The report that payroll generates, is it entirely automated?
>
> A: Yes.
>
> Q: How does it calculate?
>
> A: It – there's a – they – it was setup – it's setup in the system to – to –
> prior to me, yes, you know, – you know, they – they put the numbers in, and
> it, you know, takes – it filters out the union, it puts in the specifics, and then
> the report gets generated.
>
> Q: Do you review that report?
>
> A: Prior to sending it out? Yes, I do.
>
> Q: Do you check it for accuracy?
>
> A: Yes.
>
> Q: How do you check it for accuracy?
>
> A: Well, you have to put in the month, that's a start, and you have to – just
> to see that – when it – look at to make sure that the people that are included
> are supposed to be, those are excluded are supposed to be excluded. I do –
> do a quick review on – on – you know, going through the names, and the
> amounts, et cetera, and then – and then I send it over.

Klugman Dep. at 43:9–45:7.  Given that Klugman testified that he was able to review the payroll report that served as the basis for the remittance report to ensure "that the people . . . included are supposed to be," defendant's argument that it had no idea who was included in its contribution payments is unsupported by the factual record.

The Fund's Delinquency Spreadsheet and declaration provide the evidence necessary to show the amount New Vista owes plaintiffs in unpaid and underpaid contributions, interest, and liquidated damages.[7]  Defendant has pointed to nothing in the Spreadsheet, remittance reports, or any other material in the record that raises a genuine dispute of fact as to plaintiff's calculation, and its bare assertion that the Spreadsheet is inaccurate does not defeat summary judgment. Therefore, the Court grants summary judgment on Count One as to Vistacare's liability for $96,008.79 in unpaid contributions, $44,584.09 in interest, and $50,101.24 in liquidated damages. *See* Revised Delinquency Spreadsheet.

Finally, the Court notes that judgment in favor of the Pension Fund under section 1145 entitles plaintiffs to reasonable attorney's fees.  29 U.S.C. § 1132(g)(2)(D).  Plaintiffs have stated that they will file a subsequent declaration detailing those fees, Mot. for Summ. J. at 12, so the Court will not address the amount of fees to be paid at this point.

> **b.  Plaintiffs are entitled to injunctive relief regarding the delinquent payments and remittance reports, but not Vistacare's future obligations.**

Although this is not specifically addressed in the summary judgment memorandum, plaintiffs also request an injunction "requiring [d]efendant to comply with its obligations to submit

---

7    Although it was not disputed by the parties, the Court notes that the Delinquency Spreadsheet is admissible as a "summary . . . offered to prove the content of voluminous admissible writings . . . that cannot be conveniently examined in court, whether or not they have been introduced into evidence."  Fed. R. Evid. 1006(a).

monthly remittance reports . . . to the Pension Fund in a timely manner" and make all past and future payments.  Mot. for Summ. J. at 21.

Count Two of the complaint alleges that Vistacare violated the parties' agreements, and therefore Employee Retirement Income Security Act, by failing to comply with its obligation to provide monthly payments remittance reports to the Fund.  Compl. ¶¶ 45–46.  The parties agree on the facts surrounding this claim:  the Collections Policy obligated New Vista to submit a contributions and remittance reports by a certain date, and New Vista failed to submit or failed to meet its deadlines several times between July 2017 and September 2024.  PSUMF ¶¶ 31–32, 81–82; Def.'s Resp. to PSUMF ¶¶ 31–32, 81–82.

ERISA authorizes a district court to award "legal or equitable relief," 29 U.S.C. § 1132(g)(2)(E), and courts in this district have consistently awarded injunctive relief ordering the defendant to submit reports and contributions for months in which it was already delinquent.  *See, e.g.*, *Serv. Emps. Int'l Union Nat'l Indus. Pension Fund v. M.R. of Amboy, LLC*, Civ. Action No. 19-1405, 2019 WL 6498867, at *3–4 (D.D.C. Dec. 3, 2019); *see, e.g., Serv. Emps. Int'l Nat'l Indus. Pension Fund v. Tandem Dev. Grp., LLC*, 274 F. Supp. 3d 1, 5 (D.D.C. 2017) (ordering defendant to submit payroll reports that had been delinquent from three previous years); *Serv. Emps. Int'l Union Nat'l Indus. Pension Fund v. LTP Generations, LLC*, Civ. Action No. 17-0942, 2019 WL 1423686, at *11–12 (D.D.C. Mar. 29, 2019) (granting equitable relief and ordering defendants to submit "outstanding reports for the period of January 2014 through April 2017").

But courts in this district are split as to whether it is appropriate to award permanent equitable relief regarding a defendant's obligations to a Pension Fund.  Some courts view a request for an order requiring the defendant to generally comply with the terms of the parties' collective bargaining agreement as a request for a permanent injunction, and they have denied relief where

the plaintiff did not satisfy the permanent injunction factors under *eBay Inc. v. MercExchange L.L.C.*, 547 U.S. 388 (2006). *See, e.g.*, *Serv. Emps. Int'l Union Nat'l Indus. Pension Fund v. Hebrew Homes Health Network, Inc.*, Civ. Action No. 17-01215, 2019 WL 4346325, at *19 (D.D.C. Sept. 12, 2019) (denying equitable relief because "[p]laintiffs have not demonstrated that they have suffered an irreparable injury or that monetary damages for a future violation would be an inadequate remedy"); *Serv. Emps. Int'l Union Nat'l Indus. Pension Fund v. Metro Man I, Inc.*, Civ. Action No. 22-748, 2023 WL 4623566, at *6 (D.D.C. July 19, 2023) ("For [p]laintiffs' second request—for an injunction ordering [defendant] to comply with its ongoing obligations to make timely contribution payments—[p]laintiffs have failed to establish an irreparable injury.").

Other courts have granted requests for prospective equitable relief without applying the permanent injunction factors, focusing instead on the defendant's past breaches and unwillingness to comply with its contractual obligations. *See, e.g.*, *Nat'l Shopmen Pension Fund v. Burtman Iron Works, Inc.*, 148 F. Supp. 2d 60, 67 (D.D.C. 2001) (enjoining defendants "from failing to submit required contributions and remittance reports in accordance with the [CBA]" because "defendants have consistently been delinquent in remitting contributions and remittance reports"); *Serv. Emps. Int'l Union Nat'l Indus. Pension Fund v. Jersey City Healthcare Providers, LLC*, 358 F. Supp. 3d 12, 29 (D.D.C. 2019) ("[T]he Court finds that injunctive relief is appropriate based on [d]efendant's demonstrated unwillingness to comply with its obligations to the pension fund."); *Boland v. Yoccabel Const. Co., Inc.*, 293 F.R.D. 13, 20–21 (D.D.C. 2013) (same).

Here, the Court will deny the portion of plaintiffs' request for an injunction ordering Vistacare to comply with its remittance report and contribution obligations. An order requiring defendant to carry out an obligation in perpetuity amounts to a permanent injunction, *see* Am. Jur. 2d § 11, *Permanent Injunctions* (Nov. 2025) (defining a permanent injunction as an order that is

"perpetual in effect" and maintained "indefinitely"), and as of this date, plaintiffs have not carried their burden to justify that type of equitable relief. The party seeking a permanent injunction "must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved. *eBay Inc.*, 547 U.S. at 391. Plaintiffs have not attempted to establish any of the factors, and irreparable harm is generally not satisfied where a money judgment, such as the one awarded in this judgment, could serve to compensate plaintiff's injury. *See Wisconsin Gas Co. v. Fed. Elec. Reg. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985) ("The possibility that adequate compensatory . . . will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm.").

In line with other courts in this district, though, the Court will grant the portion of plaintiffs' request for an order that Vistacare submit all past monthly remittance reports and payments it owes to the Fund. The undisputed facts establish that the Pension Fund is entitled to the outstanding reports and payments, and that defendant has failed to comply with those obligations. Therefore, in its discretion under section 1132(g)(2)(E) of ERISA, the Court will order defendant to submit all outstanding contribution payments and reports.

### c. Vistacare is liable for the previous judgment against TNUZEG because it is a successor and alter ego.

Count Three of the complaint asserts that Vistacare is liable for the unsatisfied prior judgment against TZNUEG as either its "successor" or "alter ego." Mot. at 15; Compl. ¶¶ 47–50. Plaintiffs point to the undisputed facts that: (1) all of the assets owned by TNUZEG, including New Vista, were transferred to Vistacare in the transaction between the companies, PSUMF ¶ 56, citing Kleiman Dep. at 135; (2) Steven and Brian Kleiman remained in the same operational roles

at New Vista through the transfer from TNUZEG to Vistacare, PSUMF ¶ 60, citing Kleiman Dep. at 108–09; (3) there were no changes to the patients or physical equipment when ownership changed, PSUMF ¶¶ 61–62, citing Kleiman Dep. at 117; (4) Vistacare did not discharge the employees who had worked for TNUZEG,  PSUMF ¶ 63, citing Kleiman Dep. at 115; and (5) Vistacare became party to the 2017 agreement that New Vista signed with the Union.  PSUMF ¶ 65, citing Kleiman Dep. at 113–14.

Successor liability is an exception to the typical common law rule that a corporation purchasing another corporation "does not assume the seller corporation's liabilities." *Bd. of Trustees of Unite Here Local 25 v. MR Watergate LLC*, 677 F. Supp. 2d 229, 231 (D.D.C. 2010), citing *Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323, 1325 (7th Cir. 1990).  Under the doctrine of successorship liability, the purchaser can assume the liabilities of the purchased corporation when the successor (1) "substantially assumes the predecessor's assets"; (2) "continues the predecessor's operations without interruption or substantial change"; and (3) "had notice of the predecessor's . . . liability at the time the successor acquired the predecessor's assets." *Trustees of IAM Nat'l Pension Fund v. M&K Emp. Solutions, LLC*, 694 F. Supp. 3d 54, 104  (D.D.C. 2023) (internal quotation marks omitted), citing *Ind. Elec. Workers Pension Benefit Fund v. ManWeb Servs., Inc.*, 884 F.3d 770, 776 (7th Cir. 2018).[8]

Although the D.C. Circuit has not yet had occasion to apply successor liability in the context of ERISA, other Circuits have applied the doctrine to hold a successor company liable for

---

[8]    Although the caselaw on successorship liability uses the term "corporation," which is a legal term describing a specific type of business entity, courts apply successorship liability to limited liability companies as well.  *See, e.g.*, *Watergate LLC*, 677 F. Supp. 2d at 231–32 (involving a corporation succeeding limited liability company); *M&K Emp. Solutions, LLC*, 694 F. Supp. 3d at 105 (same).

the delinquent payments of the purchased company. *See Upholsterers' Int'l Union Pension Fund*, 920 F.2d at 1329 ("[W]e believe that the congressional policies animating [ERISA] support the imposition of successor liability for unpaid multiemployer pension fund contributions . . . ."); *Pension Benefit Guar. Corp. v. Findlay Indus., Inc.*, 902 F.3d 597, 609 (6th Cir. 2018) ("[B]ecause the federal-common-law doctrine of successor liability serves fundamental ERISA policies, we conclude that the creation and application of federal common law is appropriate . . . ."); *Hawaii Carpenters Tr. Funds v. Waiola Carpenter Shop, Inc.*, 823 F.2d 289, 295 (9th Cir. 1987) (holding successor company liable for delinquent fund payments of predecessor company); *Einhorn v. M.L. Ruberton Const. Co.*, 632 F.3d 89, 93 (3d Cir. 2011) ("It is settled that successor liability may be imposed for delinquent ERISA fund contributions in the context of a merger."). And at least two courts in this district have applied successor liability in suits under ERISA for delinquent contributions and withdrawal liability. *MR Watergate*, 677 F. Supp. 2d at 232–33; *M&K Emp. Solutions, LLC*, 694 F. Supp. 3d at 104–06.

For its part, defendant Vistacare does not dispute the applicability of successor liability, and it does not dispute the first two elements of the doctrine. It argues only that it had no knowledge of the prior judgment against TNUZEG because Steven and Brian Kleiman "were not the owners" of TNUZEG or Vistacare, and it adds that even though the Kleiman brothers' wives were nominally the owners of both companies, the two Rivkas "had no knowledge of the businesses operations" either. Opp. to Summ. J. at 7–8; Def.'s Suppl. Resp. [Dkt. # 39].

Vistacare's effort to avoid liability does not hold up against the undisputed facts. The record is consistent with the defendant's assertion that the wives had no knowledge about the operations of TNUZEG or Vistacare; that was by their husbands' design. Defendant admitted that the Kleiman brothers chose to put their shares of New Vista in their wives' names when 300

Broadway first brokered the deal to purchase the nursing home. PSUMF ¶ 46; Def.'s Resp. to PSUMF ¶ 46. Then TNUZEG, also nominally owned by the Rivkas, purchased the interests of the other three business partners. PSUMF ¶ 48, citing Kleiman Dep. at 30, 121–26. If it is undisputed that neither wife had knowledge of the operations of New Vista at any period, who was running New Vista through TNUZEG? The undisputed facts establish that it was Brian and Steven Kleiman, the only two individuals left who were a part of the original deal to buy New Vista. Indeed, defendant has admitted that the brothers had operational roles at New Vista that remained the "same" between TNUZEG and Vistacare. Kleiman Dep. at 108–09; PSUMF ¶¶ 14, 60; Def.'s Resp. to PSUMF ¶¶ 14, 60.

Notice can be shown by "presenting evidence that allows the fact finder to imply knowledge from the circumstances." *Tsareff v. ManWeb Services, Inc.*, 794 F.3d 841, 847 (7th Cir. 2015), quoting *Artistic Furniture*, 920 F.2d at 1329. All of the circumstances here indicate that the Kleiman brothers operated New Vista under both TNUZEG and Vistacare, and therefore would have had knowledge of the prior judgment against TNUZEG, even if they were not nominally the owners of the company. Defendant has not pointed to any facts that give rise to a genuine dispute about that.

Even if the successor liability theory falters on that basis, notice is not a required element under the alter ego doctrine, which the D.C. Circuit has applied in the ERISA context to "enabl[e] . . . trustees to recover delinquent contributions from a sham entity used to circumvent the participating employer's pension obligations." *Flynn v. R.C. Tile*, 353 F.3d 953, 958 (D.C. Cir. 2004); *see Island Architectural Woodwork, Inc. v. Nat'l Lab. Rels. Bd.*, 892 F.3d 362, 371 (D.C. Cir. 2018) ("An alter ego relationship may operate, for example, where one entity completely shuts down and is replaced by another . . . .").

The alter ego doctrine "holds an employer responsible for the contractual or statutory obligations of a nominally separate employer where the circumstances show the latter is not actually distinct, but operates as the 'alter ego' of the first in a 'disguised continuance of the predecessor's operations.'"  *Island Architectural Woodwork, Inc.*, 892 F.3d at 370, quoting *Fugazy Cont'l Corp. v. Nat'l Lab. Rels. Bd.*, 725 F.2d 1416, 1419 (D.C. Cir. 1984).  To determine whether two nominally distinct unincorporated businesses are alter egos, the Court evaluates the similarities between the two enterprises in their ownership, management, business purpose, operations, equipment, and customers.  *Id.*  The Court also looks at any transactions or other dealings between the two entities.  *Id.*

Again, the undisputed facts show that TNUZEG and Vistacare had the same ownership, management, business purpose, operations, equipment, and customers.  Both entities were nominally owned by Rivka B. Kleiman and Rivka C. Kleiman.  PSUMF ¶¶ 49–55; Def.'s Resp. to PSUMF ¶¶ 49–55.  Management remained the same between the two businesses as Brian and Steven Kleiman retained the same operational roles at both.  PSUMF ¶ 60; Def.'s Resp. to PSUMF ¶ 60.  And New Vista's business purpose and operations remained the same through the transfer, with Vistacare retaining the same patients, employees, and equipment as TNUZEG.  PSUMF ¶¶ 61–63; Def.'s Resp. to PSUMF ¶¶ 61–63.  Therefore, in addition to finding that Vistacare is liable for the prior judgment against TNUZEG as its successor, it also finds that Vistacare is liable as TNUZEG's alter ego.

II.    **Plaintiffs are entitled to partial default judgment against defendant 300 Broadway.**

    a.    **The Court has subject matter jurisdiction over the lawsuit and personal jurisdiction over defendant.**

As a threshold matter at the default judgment stage, the Court must determine whether it has jurisdiction over the case. *James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996) (describing the court's "affirmative obligation 'to consider whether the constitutional and statutory authority exist . . . to hear each dispute'").

Here, plaintiffs brought suit under the Employee Retirement Security Act, and the Court has subject matter jurisdiction under both ERISA and 28 U.S.C. § 1331. ERISA provides that "the district courts of the United States shall have exclusive jurisdiction of civil actions" brought under the statute. 29 U.S.C. § 1132(e)(1). And because ERISA itself is a federal law, the Court also has subject matter jurisdiction under the federal question statute. *See* 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").

The Court also has personal jurisdiction over 300 Broadway. ERISA contains a venue provision that "an action . . . may be brought in the district where the plan is administered, where the breach took place, or where a defendant resides or may be found, and process may be served in any other district where a defendant resides or may be found." 29 U.S.C. § 1132(e)(2). Courts in this district have consistently held that the provision authorizes "nationwide service of process," *see, e.g.*, *Mazzarino v. Prudential Ins. Co. of Am.*, 955 F. Supp. 2d 24, 28 (D.D.C. 2013); *Metro Man I, Inc.*, 2023 WL 4623566 at *3, and when a statute allows for nationwide service of process, "minimum contacts with the United States suffice" for the Court to exercise personal jurisdiction. *Secs. & Exch. Comm. v. Bilzerian*, 378 F.3d 1100, 1106 n.8 (D.C. Cir. 2004). The complaint

alleges that defendant 300 Broadway is a company that operates and has its principal place of business in New Jersey, Compl. ¶ 8, and thus it has minimum contacts with the United States sufficient to satisfy the standard for personal jurisdiction.

Venue is also proper in the United States District Court for the District of Columbia pursuant section 1132(e)(2) as "the district where the plan is administered," Compl. ¶ 5, and service was properly effected on defendant via an authorized agent under Federal Rule of Civil Procedure 4(h)(1)(B). Return of Serv. Aff. at 1. Therefore, the Court has proper jurisdiction over this case.

### a.   300 Broadway is jointly and severally liable for the judgment against Vistacare, including the unpaid judgment against TNUZEG.

Next, the Court determines whether default judgment is appropriate and the extent of the defendant's liability.

"To warrant a default judgment, the defendant must be considered a totally unresponsive party, and its default plainly willful, reflected by its failure to respond to the summons and complaint, the entry of a default, and the motion for a default judgment." *Teamsters Local 639-Emps. Health Trust v. Boiler & Furnace Cleaners, Inc.*, 571 F. Supp. 2d 101, 107 (D.D.C. 2008) (internal quotation marks omitted). Given "the absence of any request to set aside the default" by 300 Broadway, or "the suggestion . . . that it has a meritorious defense," *Int'l Painters & Allied Trades Indus. Pension Fund v. Auxier Drywall, LLC*, 531 F. Supp. 2d 56, 57 (D.D.C. 2008), the Court concludes that default judgment is appropriate in this case.

In their supplemental memorandum, plaintiffs clarified their position that 300 Broadway is jointly liable for any judgment made against Vistacare. Pls.' Suppl. Mem. at 6–7. Joint and several liability applies when "two or more defendants jointly cause harm," and it holds each defendant

liable for the entire amount of the harm, even though plaintiff can recover only once for the full amount. *Honeycutt v. United States*, 581 U.S. 443, 447–48 (2017).

At default judgment, the Court takes the well-pleaded factual allegations in the complaint as true to determine liability, *Boland v. Elite Terrazzo Flooring, Inc.*, 763 F. Supp. 2d 64, 67 (D.D.C. 2011), and here, the allegations and documents provided have established joint and several liability. There has been a continuity of ownership between these entities, and the repeated re-organizations putting the businesses in the Rivkas' names while assigning them no day-to-day responsibilities seems to have been designed to shield the Kleiman brothers from liability despite their unchanged role in the ongoing management of New Vista. Compl. ¶¶ 33–36. In addition, 300 Broadway submitted reports on behalf of New Vista until at least March 2023, Pls.' Suppl. Mem. at 6, citing March 2023 Remittance Report (showing a remittance report submitted by "300 BRDWY HLTHCR CENTR, DBA NEW VISTA"), and it did not ever withdraw from the Pension Fund. Given that it is not clear which limited liability company has the funds to satisfy the judgment in its accounts, and that despite being on notice, 300 Broadway never defended this action to dispute its liability, the Court awards default judgment in favor of plaintiffs, and finds that 300 Broadway is jointly and severally liable for the judgment against Vistacare, including the unpaid judgment against TNUZEG.[9]

---

[9]    Plaintiffs also argued that that 300 Broadway was liable for the prior judgment against TNUZEG as its successor. Mot. at 17–18. The standard for successorship liability requires that 300 Broadway: (1) substantially assume TNUZEG's assets; (2) continue TNUZEG's operations without interruption or substantial change; and (3) have notice of TNUZEG's liability, *M&K Emp. Solutions, LLC*, 694 F. Supp. 3d at 104, but there are no allegations in the complaint that establish any of those elements as to 300 Broadway, so the Court will not grant default judgment on that ground.

        **a.      Plaintiffs are entitled to injunctive relief as to the delinquent contributions and reports, but not future obligations.**

Finally, plaintiffs are entitled to the same equitable relief that the Court ordered against Vistacare.  The motion for default judgment suffers from the same defect as the summary judgment motion in that it does not attempt to establish any of the factors necessary for the Court to issue a permanent injunction requiring defendant to meet its future obligations to the Fund.  But given the allegations regarding defendant's past failure to comply, and its failure to participate in the instant judicial process, the Court will order 300 Broadway to submit all outstanding contribution payments and reports in a timely manner.

## CONCLUSION

For the reasons stated above, plaintiffs' motion for summary judgment against defendant Vistacare [Dkt. # 35] and motion for partial default judgment against defendant 300 Broadway [Dkt. # 33] will be **GRANTED IN PART** and **DENIED IN PART**.  A separate order with the total award, not including attorneys' fees, will issue.

AMY BERMAN JACKSON
United States District Judge

DATE:  February 6, 2026

28